IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  11-cv-02233-WYD-MJW

CBS OUTDOOR, INC., a Delaware Corporation,

Plaintiff,

v.

800 LINCOLN LLC, a Colorado Limited Liability Company,

Defendant.

---

## ORDER ON SUMMARY JUDGMENT MOTIONS

---

I.    INTRODUCTION

THIS MATTER is before the Court on the parties' motions for summary judgment.

Defendant 800 Lincoln LLC ["800 Lincoln"] filed its Motion for Summary Judgment on

October 21, 2011.  A response was filed on November 28, 2011, a reply was filed on

December 15, 2011 and a surreply was filed on December 30, 2011.  Plaintiff CBS

Outdoor, Inc. ["CBS"] filed its Motion for Summary Judgment on January 13, 2012.  A

response was filed on February 15, 2012, and a reply was filed on March 5, 2012.

A fundamental issue in this lawsuit is which party owns the outdoor advertising

sign ["the Sign"] – and more specifically, the supporting framework or structure for that

sign ["the Framework"]– located on the roof of a building owned by 800 Lincoln.[1]  A

---

[1]  It is undisputed that CBS is the owner of the removable advertising poster panels and related
advertising copy, temporary fastening mechanisms and illumination (collectively, the "Poster Panels").
The Poster Panels are attached to the Framework.  800 Lincoln refers to the structure that supports the
Sign as the "Permanent Framework".  CBS refers to it as "the supporting structure."  I refer to it as "the
Framework" as I believe this is a neutral term.

secondary issue is whether 800 Lincoln may permit a sign to be operated on the roof of its building by anyone other than CBS prior to the expiration of the original term of the 2006 Sign Location Lease between the parties ("2006 Lease" or "Lease").

Defendant 800 Lincoln moves for entry of summary judgment:  (a) dismissing the declaratory judgment claim by CBS that it is the legal owner of the Framework attached to the subject property and is therefore entitled to remove the Framework; and (b) determining that 800 Lincoln owns the Framework and is entitled to all rights related to such ownership in accordance with 800 Lincoln's counterclaim for declaratory judgment. CBS moves for summary judgment in its favor on its claims for declaratory judgment that: (1) CBS is the legal owner of the Sign at issue in this litigation, including the Framework, and is entitled to remove the Sign; and (2) no party other than CBS can maintain or operate any off-site commercial advertising sign on the building owned by 800 Lincoln until January 2, 2016.  Correspondingly, CBS moves for summary judgment dismissing 800 Lincoln's reciprocal claim for declaratory judgment that it is the owner of the Framework for the Sign.

800 Lincoln asserts that the undisputed evidence demonstrates that the Framework is an improvement and appurtenance to the Building and therefore, as a matter of law, was conveyed to it pursuant to the chain of title for real property.  It further contends that the 2006 Lease under which CBS asserts ownership fails because CBS was never conveyed actual ownership of the framework.  CBS asserts that the 2006 Lease between the parties unambiguously provides that the "existing sign on the premises" is the property of CBS and that CBS has the express right to remove it at any

time.  It further asserts that the Court need not reach the issues raised in 800 Lincoln's motion because the express language of the Lease begins and ends the inquiry into who owns the Permanent Frame.  Similarly, CBS asserts that Addendum 1 to the 2006 Lease plainly and unambiguously precludes 800 Lincoln from permitting another party to operate or maintain a sign on its property until January 2, 2016, the expiration date of the original term of the Lease.

For the reasons discussed below, Plaintiff's summary judgment motion is granted in part and denied in part.  Defendant's summary judgment motion is denied.

II.   FACTUAL BACKGROUND

I first note that the parties tendered voluminous facts and evidence in this case.  I have not discussed every fact tendered by the parties, only those that are most material to my findings.  I have, however, reviewed and considered all the facts and evidence. Where the facts are unsupported by evidence, are argumentative and/or are conclusory, I have disregarded them.  Also, where the facts are undisputed or I did not feel it was necessary, I have not cited to the record.  Finally, some facts are addressed only in the analysis to avoid duplication.

A.   Ownership of the Building at 800 Lincoln Street

800 Lincoln is the owner of a commercial building located at 800 Lincoln Street, Denver, Colorado [the "Building"].  800 Lincoln acquired title to the Building in December 2010 pursuant to a Special Warranty Deed ["the Deed"] granted by the then-owner, Capone Family Partnership, LLLP ["Capone Partnership"].  The Deed states that the Grantor "does hereby grant, bargain, sell, and convey unto Grantee all of that certain lot

or parcel of land together with the improvements thereon and appurtenances thereto

. . . ."  (Def.'s Mot. Summ. J. ["Def.'s Mot."], Ex. A-1 at 1.)  Indeed, all of the transfers of

ownership of the Building from 1962 until 2010 when 800 Lincoln acquired the Building

included appurtenances and improvements.  (*Id.*, Exs. A-2 - A-5.)  CBS does not deny

what the Deeds say, but denies that the conveyances included any property that the prior

owners of the Building did not own, including the Sign and all portions thereof.

      B.    <u>The Origination of the Sign</u>

      Roy J. Myers owned the Building in 1962, and entered into a lease with General

Outdoor Advertising Co., Inc. ["General Outdoor"].  The 1962 Lease was for the "roof of

the entire premises" and stated that "all structures, materials and equipment placed upon

said premises by Lessee shall always remain Lessee's personal property and may be

removed by Lessee at any time up to a reasonable time after the termination of this

Lease."  (Pl.'s Resp. to Def.'s Mot. Summ. J. ["Pl.'s Resp."], Ex. 2.)  The 1962 Lease

referred to the sign on the roof of the Building as Lessee's sign.  (*Id.* – "Lessor will not

permit Lessee's signs to be obstructed," "Lessor guarantees to Lessee free access to. . .

remove its advertisements and structures," "If Lessee's sign, structures, and equipment

are relocated. . .," "removal of Lessee's sign structures").

      On or about July 16, 1962, General Outdoor, as lessee of "the Roof", obtained a

sign permit from the City and County of Denver [the "1962 Permit"] to construct a new

sign on the Building's roof.  (Def.'s Mot. Ex. A-8.)[2]  It appears at that time that there was

---

    [2]  The 1962 Permit approved the "sign structure only", and did not approve the "existing building frame that is required to carry sign loads including wind."  (Def.'s Mot. Ex. A-8.)  The Permit authorized the 1962 Tenant to install as part of the "sign structure" three "units" which were described as "3 –12'x 25'

no rooftop sign or supporting sign structure located above the roofline of the Building.[3]

It further appears that pursuant to the 1962 Permit, General Outdoor built the Sign – a

rooftop outdoor advertising sign, including supporting structure and metal support beams

that extended above the roofline of the building, *i.e.,* the Framework.

  C. <u>Structural Details of the Sign</u>

  800 Lincoln argues that the removable Poster Panels of the Sign are separate

and distinct from the immovable Framework, citing the report of its structural engineer.

(Def.'s Mot., Ex. A-7.)  It also asserts that the Poster Panels and a portion of the

Framework are located on top of the Building, and that part of the Framework is located

elsewhere.  (*Id.*, Exs. A-6, A-7.)  Further, it contends, citing to its structural engineer's

reports, that there is an interior wall that supports the sign improvements on the roof, and

that the Building is an integral part of the Framework's wind resistance system.  (*Id.*, Ex.

A-7; *see also* Def.'s Resp. to Pl.'s Mot. Summ. J. ["Def.'s Resp.], Exs. A and B.)

  As to the construction of the Framework, 800 Lincoln asserts that it consists of

horizontal wind girts, which are anchored to vertical steel support trusses, which are

---

Poster Panels", "Faces –Metal", "Mouldings –Metal", and "Illumination –Shielded Fluorescent tubes." (*Id.*)
CBS asserts that the word "existing building frame" as used in the Permit refers only to the Building itself
and not to any portion of the structure above the roofline, citing to the report of its structural engineer.
(Pl.'s Resp., Ex. 1 at 2.)  While 800 Lincoln asserts that a structural engineering perspective is immaterial
and cannot be used to define terms in the Permit, I note that the report of its structural engineer, Julian
Lineham, disagrees with CBS' engineer.  Mr. Lineham opined in his report "that based on the integration of
the steel framework with the building it is our opinion that the framework was intended to be permanent,
and it forms the 'existing building frame that is required to carry sign loads including wind' as stated on the
1962 Building Sign Permit."  (Def.'s Mot., Ex. A-7 at 3.)  The meaning of "existing building frame" thus
appears to a disputed issue of fact; however, it is not material to my decision.

  [3]  While 800 Lincoln may dispute this, it has offered no evidence to show that there was an
existing sign on the Building at that time.  Whether an existing structure was already on the premises at
that time is, however, immaterial to my decision.

supported by two horizontally-spanning steel trusses and two steel beams, which are permanently anchored to poured-in-place concrete cap beams, exterior walls of the Building, structural steel of the Building and an interior wall of the Building that was built for the sole purpose of becoming part of the Permanent Frame.  Citing to the report of its structural engineer, 800 Lincoln argues that the Permanent Frame is a supporting structure that does not simply lie on the roof of the Building as CBS attempts to portray, but rather is ntegrated into the Building itself.  (Def.'s Mot., Ex. A-7 at 1-3 and Figure 1; *see also* Ex. A-15.)  Thus, 800 Lincoln contends that removal of the Framework would damage the building structure and require remedial work.  (*Id.*, Ex. A-7 at 2-3.)  Further, it contends that the Framework cannot be removed and used elsewhere, as it was clearly designed and constructed for integration into the unique particulars of the Building.  (*Id.*)

CBS denies that the Poster Panels are separate and distinct from the Sign's Framework and further denies that the Framework is immovable.  Citing to structural engineer James Robert Harris' report, CBS asserts that the Poster Panels and the Framework are interrelated components of the Sign, and the entire Sign, including the Framework, may be removed from the Building.  (Pl.'s Mot. Summ. J. ["Pl.'s Mot."], Ex. 1 at 2-4.)  CBS also contends, citing to Mr. Harris' report, that the entire Sign, including all the Framework, is located on top of the building.  (*Id.*)  It asserts that 800 Lincoln's reference to an interior wall has no bearing on whether the 2006 Lease vests ownership in CBS of the entire Framework that extends above the roof line.  (*Id.*)  And it asserts that the entire metal support structure extending above the Roof could be removed without

causing any damage or modification to the Building, and no part of the support structure for the Sign has any impact on the structural integrity of the Building.  (*Id.*)[4]

It is also pointed out by CBS that it has recently removed similar supporting structures from two other buildings without any damage to the buildings on which such signs were located.  (Pl.'s Resp., Ex. 12 – Venard Decl. ¶ 8.)  Further, it argues that no part of the Sign is inside the Building; specifically, no interior or exterior walls were built to support any portion of the Sign.  (*Id.*, Ex. 1 at 2.)  CBS asserts that neither the Sign nor any portion thereof has ever had any relation to the purpose or function of the Building, and if the Sign were removed from the Building, it would have independent value after removal and most parts of it could be used elsewhere.  (*Id.*)[5]

Finally, it is asserted by CBS that in the outdoor advertising industry, and specifically the industry for outdoor advertising sign leases, the customary norm is for the word "sign" to refer to both the actual display and to all supporting structures necessary to sustain the display, referring to paragraph 2 of the Declaration of Bruce Brenneman ["Brenneman"], the Vice President of Real Estate at CBS.  (Pl's Resp., Ex. 3.)  800

---

[4]  CBS also relies on the report of its structural engineer for the following additional assertions. (Pl.'s Mot., Ex. 1 at 2-3.)  The entire metal support structure and support beams extending above the roof line of the Building were constructed on the roof for the fundamental purpose to facilitate the display of outdoor advertising.  The concrete caps were put in place solely for the purpose of connecting the Sign to the Building and are not part of the Building.  The metal support structure and support beams have no purpose, structural or otherwise, other than to facilitate the display of outdoor advertising; therefore, this supporting structure is a part of the Sign.  800 Lincoln denies the opinions of CBS' expert and objects to CBS's introduction of extrinsic evidence concerning the 2006 Lease.  It further denies that any term of the 2006 Lease should be defined using extrinsic industry definitions or engineering perspectives, and contends that these allegations are immaterial in light of CBS' argument that the Permanent Frame is a trade fixture constructed in 1962.

[5]  Again, 800 Lincoln denies the opinions of CBS' expert and asserts that these allegations are immaterial in light of CBS' argument that the Permanent Frame is a trade fixture constructed prior to the 1962 Lease.

Lincoln denies this, but does not provide any evidence to refute Brenneman's Declaration as to what the customary norm is in the industry for the word "sign".

> D.   <u>CBS' Ownership Interest in the Sign</u>

CBS asserts that its ownership interest extends to the Sign constructed in 1962 pursuant to the 1962 permit.  It contends that it is a successor to General Outdoor's interest in the Sign, including its supporting structure.  (Pl.'s Resp., Ex. 3 - Brenneman Decl. ¶ 3.)  CBS' interest in the Sign and its Framework first arose in 1996, when it purchased various outdoor advertising displays and structures, allegedly including the Sign and Framework, from Gannett Outdoor Company of Colorado ["Gannett"].  CBS was operating under the name "Outdoor Systems, Inc." at that time.[6]  When CBS purchased certain Gannett assets in 1996, it became the successor tenant to a Lease entered into between Gannett and Capone Partnership in 1982 ["the 1982 Lease"].  (Def.'s Mot., Ex. A-9.)  Pursuant to the 1982 Lease, Gannett leased "the entire roof of the building known as 800 Lincoln - space for two (2) 12' x 25' poster panels erected side by side on roof." (*Id.*)  That Lease states that Lessee has "free access to and use of said roof. . .for the installation and maintenance of its signs on said roof. . . ." (*Id.*)

CBS also affirmatively states that it became the successor to Gannett under a lease between Gannett, as lessee, and John J. Capone ["Capone"] as lessor, dated February 28, 1994 ("the 1994 Lease").  (Pl.'s Resp., Ex. 4.)  Capone is a representative of Capone Partnership.  While 800 Lincoln admits that CBS is a successor to Gannett, it

---

[6]  CBS has also been known as Infiniti Outdoor, Inc., Viacom Outdoor Inc., and CBS Outdoor Inc.

denies that Gannett ever owned the Framework for the Sign.  Thus, 800 Lincoln asserts

that Gannett never had any title to convey to CBS.

CBS maintains that ownership of the Sign, including the Framework and the

permit rights described in the 1962 Permit, passed through a series of agreements from

one sign advertising company to another until CBS' purchase of the Sign from Gannett in

1996.  (Pl.'s Resp., Ex. 3 ¶ 5.)  Indeed, CBS argues that since the Sign was constructed,

all of the rooftop leases between the outdoor sign companies operating the Sign and the

Building owners have confirmed that the Sign and the supporting structure or Framework

were to remain the personal property of the sign company, citing the following:

> a. April 28, 1970 Lease between Mullins Outdoor Advertising Co. and Burstein- Appelbee Company: "All signs, structures, materials and equipment placed upon the said premises by the Lessee shall always remain the personal property of and may be removed by the Lessee." (Pl.'s Resp., Ex. 5 – also referring to "Lessee's signs or structures" and "the signs or structures of the Lessee").

> b. January 31, 1979 Lease between Eller Outdoor Advertising Co. and Hadden- Griffin Properties, Inc.: Lease for "the exclusive advertising use of the [property] and to service and maintain ELLER's advertising signs." (*Id.*, Ex. 6.)

> c. November 10, 1982 Lease between Gannett and Capone:  "All signs, structure, materials and equipment placed upon the said premises by the Lessee shall always remain the personal property of and may be removed by the Lessee prior to or within a reasonable time after the expiration of the term hereof or any extension thereof." (*Id.*, Ex. 7 – also referring to "Lessee's signs or structures" and "the signs or structures of the Lessee").

> d. February 28, 1994 Lease between Gannett and Capone:  "All structures, equipment, and materials placed upon the said premises by the Lessee shall always remain the personal property of, and may be removed by the Lessee at any time." (*Id.*, Ex. 4 ["1994 Lease"] (also referring to "the signs or structures of Lessee," "Lessee's structures," and "Lessee's signs").

e. January 1, 2001 Sign Location Lease between Infinity Outdoor, Inc., formerly known as Outdoor Systems, Inc., and the Capone Partnership: "[A]ll structure(s) and appurtenances thereto placed on the premises by Lessee, its agent or predecessor shall remain the property of Lessee and that, notwithstanding that same shall constitute a trade fixture, Lessee shall have the right to remove same at any time during the term or after the expiration of the Lease.  If Lessee removes its structure(s), only the above grade portions shall be removed."  (Pl.'s Resp. Ex. 8 ["2001 Lease"] (also providing that "[a]ll [sign] permits shall always remain the property of Lessee" and referring to "Lessee's structure(s)" and "its sign structure(s)").

Further, CBS notes that under the 1994 Lease and 2001 Lease, all structures and materials placed upon the roof of the Building by the sign companies were deemed to be their personal property.  (Pl.'s Resp., Exs. 4, 8.)  800 Lincoln denies this.

CBS further asserts that, separate and apart from the leases, ownership of the Sign was transferred between the sign owners.  It purchased the Sign from its predecessor Gannett in 1996, and has presented evidence that title to the Sign passed directly from one sign company to another through a series of agreements – *i.e.*, agreements evidencing the sale and/or acquisition of the Sign – beginning with General Outdoor and culminating with CBS' purchase of the Sign from Gannett.  (Pl.'s Resp., Ex. 3 – Brenneman Decl. ¶¶ 3-5.).[7]

Since 1996, CBS has made a number of substantial additions and modifications to the metal supporting structure of the Sign which are set forth in its Response to Defendant's Motion for Summary Judgment and in the Declaration of Don Venard, attached as Exhibit 12 to the Response.  CBS also asserts that, since 1996, it has maintained the supporting structure of the Sign at its "sole expense".  (Pl.'s Resp., Ex. 12

---

[7]  The permit for the Sign has also always been held by the owner of the Sign, not the owner of the Building.

– Venard Decl. ¶ 7.)  While 800 Lincoln contends that the modifications are immaterial since none of them were made to elements comprising the Framework to the Sign, it has presented no evidence to refute CBS' evidence to the contrary.

E.     The 2006 Lease Regarding the Sign

In 2006, CBS (then operating as Viacom Outdoor Inc.) entered into a Sign Location Lease with the then-owner of the Building, the Capone Partnership.  The signatories were Brenneman on behalf of CBS and Capone on behalf of Capone Partnership.  The Lease "grants exclusively to [CBS] that portion. . . of the below-described real property,. . . that is currently used by LESSEE for the sign currently constructed on the roof of the building located on the property described below, along with the exclusive right to use and maintain the sign currently constructed on said premises (with reasonable access to and upon same) for the purpose of erecting, constructing, installing, placing, operating, and maintaining the above-referenced sign of LESSEE on such property including supporting structures, illuminating facilities and connections, service ladders and other appurtenances and ancillary equipment."  (Pl.'s Mot., Ex. 2 ¶ 1.)  Other provisions of the Lease are discussed in my analysis.

The parties admit that 800 Lincoln is the successor in interest to the Capone Partnership under the 2006 Lease, and Viacom Outdoor Inc. is the former name of CBS. Accordingly, both 800 Lincoln and CBS are parties to the 2006 Lease.

The original 2006 Lease did not give the lessor the right to terminate the Lease at any time or for any reason.  (*See, e.g.,* Pl.'s Mot., Ex. 2.)  A termination clause was added to the Lease in the Addendum in exchange for a Restrictive Clause that limited

800 Lincoln's ability to allow off-site commercial advertising signs for the duration of the lease, through January 2, 2016.  (*Id.*)  800 Lincoln contends that the Restrictive Clause does not apply to it, as it applies only in the event of a termination for development, not for sale as happed in this case.  CBS disagrees, asserting that the Restrictive Clause applies in the case of either termination for sale or development, and that since the lease was terminated by 800 Lincoln (albeit allegedly improperly), it is applicable.  CBS also clarifies that it seeks to apply the Restrictive Clause only as to the roof of the Building.

F.      The Parties' Actions Since the Purchase of the Building

800 Lincoln purchased the Building in December 2010.  800 Lincoln contends that the presence of the Framework to the Sign and its ability to provide value and utility to the Building was one of the reasons that it decided to purchase the property.

In connection with the purchase, 800 Lincoln sent a letter dated December 16, 2010, which it claimed constituted notice to CBS pursuant to the Restrictive Clause that the 2006 Lease would terminate 60 days after the closing on December 28, 2010.  (Pl.'s Mot., Ex. 6.)  The letter states that it "serves as notice that if (but only if) the sale [of the Building] closes, the Lease will be terminated "for Sale or Development," pursuant to Section 2 of the Addendum."  (*Id.*)  CBS admits receipt of the letter, but denies that 800 Lincoln had the right to terminate the Lease or that the Lease was properly terminated. In an email dated December 23, 2010, 800 Lincoln explained that its goal was not to cancel the Lease, but rather to renegotiate new lease terms that it believed were more equitable.  (*Id.*, Ex. 7.)

Thereafter, 800 Lincoln and CBS entered into a letter agreement effective February 26, 2011, to determine whether the parties could agree to the possible terms for a new, multi-year lease.  (Def.'s Mot., Ex. A-11.)  Pursuant to that agreement, the parties acknowledged that they disputed, ". . .among other things, what, if any, portion of the sign on the premises and any appurtenances thereto or other structures on the premises are owned. . ." by 800 Lincoln or CBS and "what, if any, portion of the sign on the premises and any appurtenances thereto or other structures on the premises . . . may be removed by [CBS] pursuant to Paragraph 6 of the Lease." (*Id.*)

On August 24, 2011, CBS filed the Complaint in this action.  On October 6, 2011, 800 Lincoln notified CBS that it was terminating CBS' tenancy.  (Pl.'s Mot., Ex. 8.)

III.   ANALYSIS

A.   Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes

over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  The court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Id.* (quotation omitted).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

"When the parties file cross motions for summary judgment, '[the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Atl. Richfield Co.*, 226 F.3d at 1148 (quotation omitted).  Cross motions for summary judgment must be treated separately – the denial of one does not require the grant of another.  *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

B.      The Merits of the Summary Judgment Motions

1.      Who Owns the Framework of the Sign

It is undisputed that 800 Lincoln was granted the right to "improvements" and "appurtenances" when it purchased the Building.  (Def.'s Mot., Ex. A-5 – Deed dated December 18, 2002 conveying to 800 Lincoln "…all the right, title, interest, claim and demand which the Grantors have in and to the real property, together with improvements...," "together with all and singular the appurtenances" and "…all of the estate, right, title, interest and claim whatsoever of the Grantors. . . . .").  The issue is whether the Sign and, more importantly, its Framework, were included in the

conveyance, as CBS asserts that the prior owners could not convey property that they did not own.  To determine that issue, both parties agree that the Court's inquiry into ownership of the Sign need proceed no further than the plain language of the 2006 Lease between the parties, although they have cited extrinsic evidence in the event I find the Lease ambiguous on this issue.

Turning to my analysis, Colorado courts have long recognized that parties to a lease may contract expressly with regard to their respective rights in a particular item, and that the parties' agreement as to ownership is enforceable.  *See Webb v. Empire Chief Mining Co.*, 78 P.2d 974, 978 (Colo. 1938); *Curtis Coal Co. v. Yampa Collieries Co.*, 18 P.2d 323, 326 (Colo. 1932).  Thus, a lease may provide that a tenant is the owner of certain fixtures or improvements, even where the lessor remains the owner of the underlying real property to which such fixtures or improvements are attached.  *See Rare Metals Mining & Mill Co. v. Western Colo. Power Co.*, 213 P. 124, 126 (Colo. 1923) (noting "general rule that whatever is affixed to the realty becomes part thereof, . . . and may not be severed and removed without consent of the owner", but that this rule does not apply as between a landlord and tenant") (quotation omitted); *Southard v. Bd. of Equalization*, 996 P.2d 208, 210 (Colo. App. 1999) ("it is not uncommon for a tenant to retain for all practical purposes the ownership of the improvements constructed pursuant to a lease"); *see also Havasu Springs Resort Co. v. La Paz Cnty.*, 18 P.3d 143, 144 (Ariz. App. 2001) ("The parties to a lease can treat improvements as the lessee's by granting control over the improvement to the lessee.").  Thus, if the parties contracted in the 2006 Lease to the ownership of the Sign and its Framework, I can make this

determination solely based on the language of the Lease, and need not determine

whether the Sign and its Framework is a trade fixture or an improvement/ appurtenance.[8]

Contract interpretation is a question of law for the court. *B & B Livery, Inc. v.

Riehl*, 960 P.2d 134, 136 (Colo. 1998). Written contracts that are complete and free from

ambiguity are deemed to express the intention of the parties, and should be enforced

according to their plain language. *May v. United States*, 756 P.2d 362, 369 (Colo. 1988).

Thus, when a contract is unambiguous, it cannot be varied by extrinsic evidence.

*Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 911 (Colo. 1996).

"The primary goal of contract interpretation is to determine and effectuate the

intent and reasonable expectations of the parties." *Copper Mountain, Inc. v. Indus. Sys.,

Inc.*, 208 P.3d 692, 697 (Colo. 2009). "'The intent of the parties to a contract is to be

determined primarily from the language of the instrument itself.'" *Bledsoe Land Co., LLP

v. Forest Oil Corp.*, 277 P.3d 838, 842 (Colo. App. 2011) (quotation omitted), *cert.

denied*, 2012 WL 1018387 (Colo. 2012). "That 'language must be examined and

construed in harmony with the plain and generally accepted meaning of the words used,

and reference must be made to all the agreement's provisions.'" *Id.* (quotation omitted).

The court can also consider "'the nature of the transaction which forms [the contract's]

subject matter'". *Id.* (quotation omitted)

Here, both parties agree that the Lease granted CBS ownership of the removable

Poster Panels. The issue before the Court is whether the 2006 Lease also granted CBS

---

[8] I also need not determine the relevance, if any, of the 1962 Permit for the Sign.

ownership of the Framework of the Sign.  Thus, I turn to the language of the Lease.  I

first note that the Lease states:

> This agreement is a Lease (not a License) and the existing sign on the premises (and any replacement sign hereafter constructed) as well as all other all [sic] structure(s), improvements and appurtenances thereto placed on the premises by or for Lessee [CBS], its agent or predecessor shall remain the property of LESSEE, and that LESSEE shall have the right to remove the same any time during the term of the Lease and for a reasonable time (of not less than 90 days nor more than 150 days) thereafter.

(Pl.'s Mot., Ex. 2 ¶ 6.)

Both parties agree, and I find, that this language gives CBS ownership of "the

existing sign" on the roof of the Building.  (*See* Def.'s Mot. at 16 - "the 2006 Lease

recognized that CBS' property included (a) the "existing sign"); *see also* Pl.'s Mot., Ex. 2

¶ 1 – referring to the Lessee's sign as "its sign".)  800 Lincoln asserts, however, that

Paragraph 6 of the Lease distinguishes between the "existing sign" and its structures,

meaning that the supporting structure or Framework of the Sign is not part of the "sign"

owned by CBS.  I disagree.

Paragraph 6 of the 2006 Lease refers to the "existing sign" as well as *all other*

structure(s), improvements and appurtenances thereto placed on the premises by or for

Lessee, its agent or predecessor.  (Pl.'s Mot., Ex. 2, emphasis added.)  As a matter of

common sense, the term "existing sign" would have to include the structure of the Sign

itself, or else the reference to "*other* structure(s)" makes no sense.  If the parties had

meant that the Sign did not include the structure or Framework, it would have referred to

the Sign and "*its* structure" as referenced in other parts of the Lease (*id.* ¶ 16– "LESSEE,

at its sole option, shall have the right to add any ancillary use to its structure(s); *see also*

¶ 20 – referring to Lessor's structure(s).)  *See Thomas v. Great W. Sugar Co.*, 773 P.2d 582, 584 (Colo. App. 1988) ("A word in a contractual provision must be construed in harmony with both its common meaning and its use elsewhere in the contract.")

This interpretation of the Lease is also supported by ¶ 1 that grants exclusively to CBS as lessee the portion of the Building "that is currently used by LESSEE for its sign . . ., along with the exclusive right to use and maintain the sign   . . . including *supporting structures*. (Pl.'s Mot., Ex. 2) (emphasis added).  The Colorado Court of Appeals has held that a lease giving the "exclusive right to use the improvements" and maintain "its building" indicated ownership).  *Southard*, 996 P.2d at 210; *see also Lamar Advantage GP Co., LLC v. Nighswander*, Nos. 2009-CA-002349-MR, 2009-CA-002407-MR, 2011 WL 1085347, at *3 (Ky. App. Mar. 25, 2011) (holding that the parties' intent from their lease established that a billboard, including its supporting structure, was owned by the lessee where the most recent lease referred to the billboard as "Lessee's sign structure" and gave lessee the responsibility to maintain, repair, and replace it).

Indeed, my finding that CBS was meant to own the display panels of the Sign as well as the Framework is supported by other references in the Lease.  The Lease repeatedly confirms that the Sign is owned by the Lessee, referring to it as "Lessee's sign(s)", "its sign", or most importantly, "its structure(s)" no less than nine times.  (Pl.'s Mot., Ex. 2 ¶¶ 1, 4, 5, 9, 10, 16, 20; *see also Southard*, 996 P.2d at 210 (holding use of phrase "its building" in reference to tenant indicated tenant's ownership).  Indeed, the Lease repeatedly details the importance to Lessee of the structure of the Sign.  (*Id.*¶ 9 – giving the lessee at its "sole option" the right to terminate the Lease if "the advertising

value of the structure(s) is significantly impaired or diminished" or if "the continued maintenance/operation of the structure(s) is impractical or uneconomical. . .", ¶ 10 – "It is the understanding of the parties that visibility of the structure(s) to the traveling public is the essence of this  Lease. . . .", ¶ 16 – "LESSEE, at its sole option shall have the right to add any ancillary use to the structure(s). . . ."  In contrast, nowhere in the Lease does the Lease ever refer to the Sign or its supporting structures as being the property of the Lessor.  In fact, the Lease expressly clarifies that "[n]othing herein shall be deemed to convey title or ownership of the sign to LESSOR."  *(Id.* at ¶ 6.)  Notably, the Lease contains no reciprocal provision disavowing conveyance of the Sign to the lessee.

My interpretation of the Lease is also supported by another provision of the Lease.  Paragraph 1 states that it is for the portion of the property "currently used by [CBS] for its sign currently constructed on the roof of the building."  (Pl.'s Mot., Ex. 2.)  Because the display or Poster Panels that 800 Lincoln contends constitutes the "existing sign" are attached to the supporting structure, it would make no sense for the Lease to refer to these panels as being "constructed" on the roof.  Further, if the word "sign" were read as referring only to the display panels, the word "roof" would need to be read to encompass the Sign's supporting structure.  Such a construction strains the meaning of the word "sign" *and* the meaning of the word "roof."  Put simply, because there would be no purpose for the supporting structure *except* to support the advertising display, 800 Lincoln's effort to separate these interrelated components defies common sense.

Finally, while not determinative of the issue, common usage of the term "sign" in the outdoor advertising industry further supports the conclusion that CBS' ownership of

the Sign extends to the Sign's supporting structure or Framework.  *See Emp't Television Enterprises, LLC v. Barocas*, 100 P.3d 37, 42 (Colo. App. 2004) ("Even if a term is not facially ambiguous, evidence of industry standards may be used to demonstrate the parties' intent.").  As stated in the Brenneman Declaration, the customary norm in the industry is for the word "sign" in a lease to refer to both the face of the display and all supporting structures.  (Pl.'s Resp., Ex. 3 at ¶ 2.)  800 Lincoln has presented no evidence to the contrary.

Based on the foregoing, I find that 800 Lincoln's strained attempt to distinguish between the Poster Panels and the supporting structure is inconsistent with both the context in which the phrase "existing sign" is used and common sense.  *See Bledsoe Land Co.,* 277 P.3d at 842 (requiring that a contract's terms be read in harmony and that the court give effect to all the contract's provisions."); *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002) ("[T]he words of the contract should be given their plain meaning according to common usage . . .").  To interpret the contract in the manner argued by 800 Lincoln would require me to disregard these other provisions of the contract, which I am not at liberty to do.  *Thompson v. State Farm Fire & Cas. Co.*, 165 P.3d 900, 902 (Colo. App. 2007).  Thus, I find that the term "existing sign" includes its Framework.

Even if I had found, however, that 800 Lincoln was correct in its argument that the term "existing sign" does not include the structure or Framework, I still find that the Lease grants ownership of the Framework to CBS.  It states in relevant part that "the existing sign on the premises . . . as *well as all other all [sic] structure(s), improvements and appurtenances thereto placed on the premises by or for Lessee [CBS], its agent or*

*predecessor shall remain the property of LESSEE*, and that LESSEE shall have the right to remove the same any time during the term of the Lease and for a reasonable time . . . thereafter." (Pl.'s Mot., Ex. 2 ¶ 6, emphasis added.) Pursuant to this paragraph, CBS owns the structure or Framework of the Sign and can remove it if it was placed on the roof "by or for" CBS' "agent or predecessor." 800 Lincoln does not dispute this, but argues that the Framework was not built by or for CBS' predecessor.

While 800 Lincoln correctly asserts that there is no evidence that the Framework was placed on the premises by Gannett, CBS' immediate predecessor, I find that when the Lease is construed as a whole, the intent of the parties was that the Framework was meant to be the personal property of CBS as it was built "by or for" CBS' "predecessor", *i.e.*, the previous outdoor advertising companies who had leases with the owners of the building before Gannett and/or who owned the Sign.

I first note that the term "predecessor" is not defined in the Lease. Thus, as discussed earlier, I must examine and construe the term "in harmony with the plain and generally accepted meaning of the words employed and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter." *Bledsoe Land Co.*, 277 P.3d at 842 (quotation omitted). As to the generally accepted meaning, I note that "predecessor" is defined in Blacks Dictionary as "**1.** One who precedes another in an office or position. **2.** An ancestor." Black's Law Dictionary 1196 (7th ed. 1999); *see also* http://www.merriam-webster.com/dictionary/predecessor (defining "predecessor" as **1** : one that precedes; *especially*: a person who has previously occupied a position or office to which another has succeeded" . . . **2** *archaic*:

ANCESTOR).  Contrary to 800 Lincoln's argument, the definition does not express or require any relation of legal privity.  The definition also does not make clear whether the term means only the immediate predecessor or can apply to additional predecessors.

I believe that the meaning of the term must be determined in reference to the intent of the parties and the circumstances in this case.  Indeed, courts have held that the term "successor", which is the correlative to the word "predecessor"[9], does not and cannot have "a formal definition" because its definition depends on the facts and the contract at issue."  *N.R.L.B. v. Jarm Enterprises, Inc.,* 785 F.2d 195, 200 (7th Cir. 1986) (citing *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249 (1974)). As noted by the Supreme Court, "[t]he question whether [a company] is a 'successor' is simply not meaningful in the abstract. . . . There is, and can be, no single definition of 'successor' which is applicable in every legal context."  *Howard Johnson Co.*, 417 U.S. at 262; see also *Safer v. Perper*, 569 F.2d 87, 95 (D.C. Cir. 1977) (the word "successor" "is a word with many legal applications and that it is therefore difficult to define precisely").

Thus, I must look to the facts of the case and the language of the Lease as a whole to determine what the parties' intent was.  First, as noted previously, there are numerous provisions in the Lease that confirm that the Sign and its structure is owned by the Lessee.  This implies that the parties recognized, at least implicitly, that the structure had to have been built by or for a predecessor.

---

[9]  A "successor" is defined as "**1.**  A person who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows another. . . ."  Black's Law Dictionary 1446 (7th ed. 1999); *see also Tidewater Oil Co. v. Worker's Comp. Appeals Bd.*, 137 Cal. Rptr. 36, 41 (Cal. App. 1977) (noting that "predecessor" is the correlative of "successor" as defined in Black's Law Dictionary).

Second and more importantly, the particular circumstances of this case support my interpretation of the Lease to mean that the Framework was built by or for CBS' predecessors and is thus owned by CBS.  CBS has presented evidence that it is the successor in interest through the series of rooftop leases between the outdoor advertising companies and the Building owners.  These leases have confirmed, since the Sign was constructed in 1962, that the Sign and any supporting structure were to remain the personal property of the outdoor advertising companies.[10]  I agree with CBS that this supports its argument that the structure of the Sign was built by or for CBS' predecessor.

I also find the case of *Outdoor Sys. Adver. Inc. v. Korth*, 607 N.W.2d 729 (Mich. App. 1999),instructive on this issue.  In *Korth*, an outdoor advertising company as lessee of a billboard lease brought an action for wrongful eviction against the building owner. The sign company was the successor in interest to billboards located on the roof and wall of the defendant's building.  607 N.W.2d at 729.  The lessee "and its (four) predecessors in interest had continuously maintained the billboards and related components since the time the original lease agreements were executed in 1922 and 1946."  *Id.*  The advertising company's "predecessors in interest renewed the lease agreements and eventually entered into new leases that included the following provision:

---

[10]   The 1962 Lease, executed before construction of the Sign and supporting structure by the then-tenant expressly provided that "all structures, materials and equipment placed upon said premises by Lessee shall always remain Lessee's personal property and may be removed by Lessee at any time." (Pl.'s Resp., Ex. 2.)  Each subsequent lease of the roof of the Building reiterated the parties' intent to treat the existing Sign and any other structures later added by the advertising company lessees as the personal property of the lessee.  (*Id.*, Exs. 4, 5, 6, 7, 8.)  The 2006 Lease then confirmed that the parties intended for the "existing sign," "including supporting structures," "as well as all other all [sic] structures . . . placed on the premises by . . . [CBS] . . . or predecessor [to] remain the property of [CBS]."  (Pl.'s Mot., Ex. 2 ¶¶ 1, 6.)

"All signs, structures, materials and equipment placed upon the said premises by the Lessee shall always remain the personal property of and may be removed by the Lessee any time prior to or within a reasonable time after the expiration of the term hereof or any extension thereof." *Id.* at 729-30. The advertising company "presented evidence that the billboards were erected by the original lessee and that there was continuous possession by its predecessors in interest without any period of abandonment" and the defendant presented no competent evidence in rebuttal. *Id.* at 730.

Consistent with 800 Lincoln's argument, the trial court determined that the panel boards or advertisements, but not the billboard structures themselves, were lessee's personal property. *Korth*, 607 N.W.2d at 730. "[T]he trial court's decision was based on evidence that though the panel boards could be removed, the billboard structures either could not be removed or removed only with great difficulty. *Id*. The Michigan Court of Appeals reversed, holding that "[t]he documentary evidence established plaintiff's ownership of the billboards and the billboard structures." Thus, it held that the sign operator, as lessor of the lease, "owned the billboards, that the billboards were trade fixtures and, consequently, were the personal property of plaintiff subject to removal by plaintiff in accordance with the terms of the billboard lease agreements." *Id.*

In this case, as in *Korth*, the express intent of the parties to each of these leases, repeated and confirmed over decades, conclusively establishes the parties' intent for the Sign to be treated as personal property of the lessee. My finding is also supported by another case. In *Lamar Advantage GP Co.*, the Kentucky Court of Appeals court held that the parties' intent established that a billboard, including its supporting structure, was

owned by the lessee where the most recent lease referred to the billboard as "Lessee's sign structure" and gave lessee the responsibility to maintain, repair, and replace it, and where prior leases granted the lessee the right to remove the billboard at the termination of the lease.  *Id.*, 2011 WL 1085347, at *3.

The facts of this case are even more supportive of CBS' argument than those in *Korth* and *Lamar Advertising* because, in addition to the leases, CBS has presented evidence of the passage of ownership of the Sign itself by separate agreements between the outdoor advertising companies.  Thus, CBS argues that, separate and apart from the leases, it is the successor through CBS' purchase of the Sign from its predecessor Gannett in 1996, and because title to the Sign passed directly from one outdoor advertising company to another through a series of agreements – *i.e.*, agreements evidencing the sale and/or acquisition of the Sign – beginning with General Outdoor and culminating with CBS' purchase of the Sign from Gannett.  (*See* Pl.'s Resp., Ex. 3 – Brenneman Decl. ¶¶ 3-5.)  800 Lincoln has presented no evidence to the contrary.  It also has not presented evidence that this chain of title to the Sign was ever interrupted, that the Sign was ever abandoned for any period of time, or that CBS or any other tenant of the roof of the Building ever conveyed the Sign or any portion thereof to the owner of the Building.  Indeed, 800 Lincoln has presented no evidence that any prior owner of the Building ever even claimed an ownership interest in the Sign.  That, as well as the continued operation of the Sign as part of the sign company lessees' outdoor advertising business, establishes that the parties to the Lease acknowledged that the Sign and its supporting structure were built by or for one of CBS' predecessors.

Thus, I find that in executing the Lease, whatever legal rights either of the parties might otherwise have had regarding the Sign and/or its Framework or however the Sign might otherwise be characterized (an improvement, appurtenance, trade fixture, etc.), the parties unambiguously agreed that the Sign and its Framework was and would remain the property of CBS and was subject to removal by it.  The parties' agreement is controlling and trumps all countervailing common law principles.[11]  Since I find that the lease is unambiguous on this issue, I have not considered the parties' extrinsic evidence presented on this issue.

Based on the foregoing, I find that CBS is the owner of the Sign and its Framework.  Accordingly, I grant the portion of CBS' Motion for Summary Judgment that seeks judgment in CBS' favor on its claim for declaratory judgment that it is the legal owner of the Sign at issue, including the Framework.  I also grant CBS' Motion to the extent it seeks dismissal of 800 Lincoln's reciprocal claim for declaratory judgment that it is the owner of the Framework for the Sign.  800 Lincoln's Motion for Summary Judgment that seeks dismissal of CBS' claims that it is the legal owner of the Framework and a determination that 800 Lincoln owns the Framework is denied.

---

[11]  The case of *Gonzales v. City & Cnty. of Denver*, No. 06CV4450 (Denver District Court, Dec. 16, 2009), a case relied on by Defendant, does not require a different result.  (*See* Def.'s Mot., Ex. 12.) *Gonzales*, like this case, concerned the ownership of a sign frame that extended above a building's rooftop.  While *Gonzales* ultimately found, notwithstanding conflicting evidence not present here, that the landlord owned the metal frame of the sign, the facts are distinguishable.  First, the case did not arise in the context of a motion for summary judgment but was based on factual determinations and an valuation of the evidence presented at trial.  Second and more importantly, the leases at issue in *Gonzales* spoke only prospectively about ownership of "structures, equipment and materials *placed upon the said premises by the lessee*".  Indeed, *Gonzales* expressly noted that the building owner's rights in the sign structure were "subject to any contractual obligation he may owe to a lessee" and explained that the circumstances may be different if the lessee had constructed the sign structure under a lease characterizing it as personal property.  (*Id.* at ¶¶ 8, 16.)  Here, unlike *Gonzales*, the 2006 Lease makes clear that the "existing sign" and structure are the property of the lessee.

However, I still have another issue to resolve in connection with the Framework; namely, whether CBS as owner is entitled to remove the Framework.  The Colorado Supreme Court holds that a tenant will be permitted to remove improvements on a building "provided this can be done without material injury to the freehold."  *Stapp v. Carb-Ice Corp.*, 224 P.2d 935, 938-39 (Colo. 1950); *see also Rare Metals Mining & Mill Co.*, 213 P. at 126.

800 Lincoln has presented evidence through the reports of its structural engineer that the Framework cannot be removed by CBS without damage to the Building, as the Framework is integrated into the Building itself.  CBS denies this, arguing in reliance on the report of its structural engineer that the Framework of the Sign can be removed without material damage to the Building.  Based on this, I find that there are genuine issues of material fact as to this issue.  *See Johns v. McFann*, 486 P.3d 36, 38 (Colo. App. 1971) (whether an improvement can be removed by the tenant is a factual determination.).  I also note that the parties did not brief or cite authority as to what constitutes "material injury" and if the removal of the Framework would meet this requirement.  Accordingly, I must deny CBS' Motion for Summary Judgment to the extent it seeks a declaratory judgment that it is entitled to remove the Framework from the Building.

Since I have, however, determined who is the owner of the Framework, I believe that the parties may be able to resolve the issues regarding removal of the Framework without further briefing or a trial.  Accordingly, I direct the parties to meet and confer and attempt a resolution of this issue.  The parties should discuss the following issues.  If

CBS is allowed to remove the Framework it owns but causes resulting damage to the Building, what is 800 Lincoln's remedy?  Conversely, what is CBS' remedy as owner of the Framework if CBS cannot remove it without causing material damage to the Building?  Also, if CBS cannot remove the entire Framework without causing material damage, can it remove a portion thereof and if so, what portion?  Certainly, CBS should be entitled to remove any portions of the Sign that can undisputedly be removed from the Building without damage.

I note that CBS asserted in its response to Defendant's motion that the only specific items that 800 Lincoln's expert claims would be damaged by the removal of the Sign are the concrete caps that attach the Sign to the Building.  CBS argues, however, that these concrete caps are not part of the Building but that if 800 Lincoln prefers to preserve them, CBS would be willing to remove the remaining portions of the Sign while leaving the concrete caps in place.  CBS also asserts that it should be entitled to at least remove the upper and lower portions of the Sign that can be detached from the base connected to the concrete caps.  These are all issues that the parties need to meet and confer about.

After the parties have met and conferred on these issues, I direct that they file a status report within 45 days, or by November 8, 2012, as to whether a resolution was reached and, if so, what action needs to be taken by the Court as to same.  If a resolution is not reached, the parties shall advise the Court as to how they wish to proceed on CBS' claim that it is entitled to remove the Framework.

       2.      <u>The Enforceability of the Restrictive Clause Regarding Off-Site Commercial Advertising</u>

       a.      <u>Whether the Restrictive Clause is Applicable</u>

CBS also moves for summary judgment in its favor on its claim for declaratory judgment that no party other than CBS can maintain or operate any off-site commercial advertising sign on the building owned by 800 Lincoln until January 2, 2016.  I find that this issue must be resolved by reference to the termination provision, Paragraph 2 of the Addendum to the 2006 Lease.  (Pl.'s Mot., Ex. 2.)  That provision states:

> In the event Lessor desires to sell or develop the premises, Lessor shall have the right to terminate this Lease for Sale or Development with sixty (60) days notice to Lessee.  Such termination for development shall be effective only upon presentation by LESSOR to LESSEE of a duly issued building permit and associated plans for such development.  *Should LESSOR exercise its right to terminate the Lease, it shall not permit another off-site commercial advertising sign to be erected, maintained and operated on the premises for the duration of the remaining Lease by any party other than LESSEE. This provision shall survive such termination.*  Such termination for sale shall be effective only after presentation by LESSOR to LESSEE of a duly-executed contract to sell the property to an unrelated third party.

(*Id.*) (emphasis added).  The italicized language in the above provision represents the Restrictive Clause.

800 Lincoln argues that the Restrictive Clause applies only where the Lease is terminated for development, not when it is terminated for sale.  It asserts that the structure of the termination provision is as follows: (1) general grant of right to terminate for sale or development; (2) articulation of logistics related to termination for development; and then (3) articulation of logistics related to termination for sale.  It

further asserts based upon the termination provision's plain language that, in the event of

a termination for development, Lessor would be required to present Lessee with a

building permit and plans and the Restrictive Clause would apply.  In the event of a

termination for sale, Lessor would be required to present Lessee with an executed

purchase contract.  However, 800 Lincoln argues that the Restrictive Clause, which

allegedly (1) describes the process related to only to termination for development; and

(2) appears before, and is not incorporated into, the sentence regarding a termination for

sale, does not apply in the case of a termination for sale.

CBS disagrees, arguing that nothing in the termination provision limits the

Restrictive Clause's application to termination for purposes of development.  Rather, the

termination provision plainly reads that in the case of termination, the Restrictive Clause

applies.  Here, since 800 Lincoln claims it terminated the 2006 Lease pursuant to the

Addendum, CBS asserts that the restraint necessarily applies and that it survives the

termination of the Lease.

Again, I am presented with a question of contract interpretation.  In this situation, I

first interpret the provisions of the termination provision that are clear and unambiguous.

The first sentence clearly and unambiguously states that the 2006 Lease may be

terminated either in the case of a termination for development or for sale.  The second

sentence states what must happen for it to be effective when the Lease is terminated for

development – *i.e.*, the LESSOR must present to the LESSEE "a duly issued building

permit and associated plans for such development."  (*Id.*)  The final sentence of the

termination provision states what must happen for the termination to be effective when

the Lease is terminated for sale – *i.e.*, the LESSOR must present to the LESSEE "a duly-executed contract to sell the property to an unrelated third party." (*Id.*)  The problem is how to interpret the Restrictive Clause in that provision, given its location.

800 Lincoln is correct that the Restrictive Clause, which restricts the Lessor's ability to permit another off-site commercial advertising sign to be erected, maintained and operated on the premises for the duration of the Lease, follows the second sentence that explains what happens for the termination to be effective when the Lease is terminated for development.  It precedes the sentence about what must happen for the termination to be effective when the Lease is terminated for sale.  Given the paragraph's structure, the Restrictive Clause could be read in the manner suggested by 800 Lincoln – that it applies only when the Lease is terminated for development.

However, the Restrictive Clause could also be interpreted to apply in the manner suggested by CBS – that it is applicable if the Lease is terminated either for development or sale.  That is because there appears to be no correlation between the Restrictive Clause and the previous sentence explaining what must happen for the termination to be effective in the case of development.  In other words, it does not appear from a reading of the termination provision as a whole that the Restrictive Clause is related in any manner to the previous sentence about termination for development.  Instead, the phrasing of the Restrictive Clause appears to connect it to the first sentence giving the right to terminate, not the second sentence that it follows.  The Restrictive Clause itself is also not limited to a termination for development.  If the parties wanted the Restrictive Clause to apply in that circumstance, they could have so stated.  For example, the

parties could have added words which I have italicized to the sentence whereby it would read, "if LESSOR exercise its right to terminate the Lease *"for development"*, it shall not permit another off-site commercial advertising sign to be erected, maintained and operated on the premises for the duration of the remaining Lease by any party other than LESSEE.  This provision shall survive such termination *for development.*"  Alternatively, the Restrictive Clause could have been prefaced to make clear that it applied only if the Lease was successfully terminated for development.  Instead, it simply states it applies in the event "LESSOR exercise its right to terminate the Lease".

Since the Restrictive Clause can be read both to support CBS' argument as well as 800 Lincoln's argument, I find that it is ambiguous.  Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation. *B & B Livery*, 960 P.2d at 136.  Once a contract is determined to be ambiguous, "'the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues.'"  *Dorman*, 914 P.2d at 912 (quotation omitted). "'[W]ritten documents containing ambiguities or unclear language must be construed in accordance with the intent of the parties, and relevant extraneous evidence may be considered to resolve the factual question of the parties' intent.'"  *Id.* at 911-12 (quotation omitted).

In the case at hand, the parties both rely on the deposition testimony of John Capone, Jr. to establish the intent of the parties regarding the Restrictive Clause. Capone's testimony first demonstrates that he wanted the ability to terminate the lease either for sale or development.  (Pl.'s Mot., Ex. 5 - Capone Dep. at 99:7-16.)  He testified

that the reason he wanted the termination provision to be added to the Lease was because Capone's company "had some people looking at the building, to purchase it, that wanted to level it and then build something else.  And at that point, I needed something in there that said if we decided to level it, that -- how much termination do I need to give the sign company, so that they could do that."  (*Id.* at 25:3-12.)

As to the Restrictive Clause, Capone was asked, "Did you understand [the Restrictive Clause] to mean that if you had terminated the lease, you couldn't have another sign company come up and operate a sign on the roof?"  (Pl.'s Mot., Ex. 5 at 100:2-5.)  Capone answered "yes" to that question (*id.* 100:6), and did not state or reference in any way that the Restrictive Clause was limited to a termination for development only.  Although Capone later testified that if he "had done some development and the building stayed there", he "understood that [he] couldn't go have another sign company operate on the roof before December 31, 2015" (*id.* 100:19-23, *see also* 101:11-25 – stating that he understood through 2015 that "we were going to. . . -- either level the building or if we kept it, we would be with the present operator"), this does not state or mean that the Restrictive Clause applied only in that circumstance. Indeed, as previously discussed, he had earlier in his deposition testified that the Restrictive Clause related to the sign applied in the event of a "termination" generally, and that he understood the termination could be either for sale or development. Accordingly, I find that Capone's testimony supports CBS' argument that the intent of the parties was for the Restrictive Clause to apply either in the event of a termination for development or for sale.

My interpretation of Capone's testimony is also consistent with CBS' intent in agreeing to the termination provision.  CBS asserts that the intent behind the provision was to allow the lessor that was selling or developing the property to terminate for sale or development, and that the "lessor" was Capone, not 800 Lincoln.  CBS contends that 800 Lincoln is an "unrelated third party" as set forth in the termination provision, and that the Restrictive Clause survives termination of the Lease.  This seems to be consistent with the phrasing of the Restrictive Clause and the termination provision as a whole.  CBS also asserts that it agreed to Capone's request in exchange for the promise that no other off-site commercial advertising sign would be erected, maintained and operated on the roof of the Building for the duration of the remaining lease term.  This restriction ensured that Capone (or his successor) could not terminate the 2006 Lease, only to enter into a new lease with one of CBS' competitors.  Again, this makes sense given CBS' concession to allowing the termination clause to be added to the Lease when it was not originally bargained for.

Based on the foregoing, I find that the Restrictive Clause applies and limits 800 Lincoln's ability to permit another off-site commercial advertising sign to be erected, maintained and operated on the roof of the premises for the duration of the remaining Lease.  However, I still have to determine whether there are genuine issues of material fact about the Restrictive Clause that prohibit its enforcement at this stage of the litigation or whether the Clause is an unreasonable restraint on alienation, as argued by 800 Lincoln.  Thus, I turn to those arguments.

b.      Whether Factual Disputes Exist Regarding Enforcement of
the Restrictive Clause

800 Lincoln argues that if the Restrictive Clause is applicable, several factual

disputes exist regarding its enforcement which are sufficient to preclude summary

judgment.  For example, it asserts that the scope of the Restrictive Clause is ambiguous

as it is not clear whether it would allow other types of advertising, *e.g.*, on-site

commercial, on-site non-commercial and off-site non-commercial advertising.  Further,

800 Lincoln asserts that the definition of "commercial" itself is ambiguous because it is

not clear whether a profit component is required.  Thus, it argues that a factual dispute

exists regarding whether the Restrictive Clause's preclusion of "off-site commercial"

advertising would prevent, for example, 800 Lincoln from displaying advertising for

off-site non-profit organizations.  I reject these arguments.

I agree with CBS that 800 Lincoln's attempts to create ambiguity in the language

of the Restrictive Clause by hypothesizing various disputes that might arise in the future

regarding what conduct might violate the terms of the Clause are irrelevant.  CBS seeks

a declaratory judgment declaring the Restrictive Clause enforceable as written, not an

advisory opinion as to what list of potential conduct would or would not violate its terms.

A declaratory judgment "'calls, not for an advisory opinion upon a hypothetical basis, but

for an adjudication of present right upon established facts.'"  *Farmers Ins. Exch. v. Dist.*

*Ct.*, 862 P.2d 944, 947 (Colo. 1993) (quotation omitted).[12]

_____

[12]  In any event, there does not appear to be a factual dispute as to these terms because CBS
does not dispute that the Restrictive Clause applies only to off-site commercial advertising.
Correspondingly, CBS also does not dispute that the Restrictive Clause is inapplicable to on-site
advertising or non-commercial advertising.  Instead, CBS seeks only enforcement of the Restrictive
Clause for commercial off-site advertising, however that phrase may ultimately be construed or applied in

Additionally, 800 Lincoln argues that CBS' claim for declaratory relief regarding the Restrictive Clause attempts to improperly extend the reach of the Clause.  In that regard, it asserts that CBS seeks to enforce the Restrictive Clause with respect to the entire Building when, pursuant to its terms, it is limited to the "premises."  This argument is also without merit as CBS has confirmed that the premises subject to the 2006 Lease includes only the roof of the Building, and that it is only seeking to enforce the Restrictive Clause as to same.  CBS has also confirmed that what 800 Lincoln does elsewhere on the Building is its business (or, depending on the particular signage at issue, the business of the City of Denver).

Finally, 800 Lincoln asserts that there is an existing factual dispute between the parties regarding the amount of market rent applicable to the Framework and Poster Panels.  It asserts that this factual dispute would only be exacerbated by the enforcement of the Restrictive Clause.  For example, 800 Lincoln points out that the 2006 Lease does not provide for the amount of rent that would be due from CBS for its use of the Framework during the period of the enforcement of the Restrictive Clause. The current term of the 2006 Lease expires in 2016.  Thus, 800 Lincoln argues that there is a factual dispute between the parties regarding the appropriate amount of rent for CBS' use of the Framework during the next four years.

I agree with CBS that 800 Lincoln's argument related to "market rent" is irrelevant to the motions before me, as it has no impact on whether the Restrictive Clause is enforceable.  It also has no impact on whether the 2006 Lease is enforceable, the other

the context of a concrete dispute.

issue before me on the summary judgment motions.  Accordingly, I reject 800 Lincoln's argument that any factual disputes regarding "market rent", or any other factual disputes, would preclude the entry of summary judgment.

        c.      <u>Whether the Restrictive Clause is an Unreasonable Restraint on Alienation</u>

Finally, 800 Lincoln argues that the Restrictive Clause is unenforceable as an unreasonable restraint on alienation.  "'The common law doctrine of restraints on alienation is part of the common law in Colorado and prohibits 'unreasonable' restraints." *Perry v. Brundage*, 614 P.2d 362, 366-67 (Colo. 1980) (quoting *Malouff v. Midland Fed. Sav. and Loan Ass'n*, 509 P.2d 1240, 1243 (1973)).  "This doctrine involves the determination of the validity of a future restraint on property transfer when weighed against the public policy that property should be freely alienable." *Id.* at 367.  The "'invalidity of a restraint depends upon its reasonableness in view of the justifiable interests of the parties.'" *Id.* (quoting *Malouff*, 509 P.2d at 1243).  In applying this test, the court "must look at the totality of the circumstances taking into account the respective interests of the parties and the duration and nature of the restraint used to enforce those interests." *Id.*  The question of the invalidity of a restraint depends upon its reasonableness in view of the justifiable interests of the parties.  *Id.*

According to 800 Lincoln, the Restrictive Clause prevents it from making use of advertising on the roof of the Building for four years, and that the advertising provides a significant source of revenue and is a material reason why 800 Lincoln purchased the Building.  The first issue I must resolve is whether the Restrictive Clause is even a

restraint on alienation.  CBS argues that it is not, as it does not prevent 800 Lincoln from selling or conveying the Building.  Nor does it preclude whichever party is deemed to own the Sign from selling or conveying the Sign.  Rather, CBS contends that the Restrictive Clause simply precludes a specified *use* for the roof of the Building – the erection, maintenance, and operation of an off-site commercial advertising sign.

Turning to my analysis, certainly the Restrictive Clause is not a classic restraint on alienation.  *See Perry*, 614 P.2d at 367 ("Classic restraints generally place a limitation upon the owner's right to sell the property to a third person.").  Here, the Restrictive Clause only prohibits 800 Lincoln's right to obtain revenue from off-site commercial advertising signs on the premises by parties other than CBS.  800 Lincoln has not cited any authority to suggest that the type of Restrictive Clause at issue is a restraint on alienation.  Further, at least one court has held that a use restriction related to property does not constitute a restraint on alienation.  *See Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 655 N.W.2d 390 (Neb. 2003).

In *Spanish Oaks*, a landlord sought a declaratory judgment that a use restriction in a sublease that permitted the premises to be used for retail purposes so long as it did not include a mass-merchandise or discount store operation was a restraint on alienation and a violation of public policy.  655 N.W.2d at 396.  The landlord "adduced evidence generally indicating that the use restriction depressed the value of Spanish Oaks' fee simple estate by reducing the income-generating potential of the property to the fee simple owner".  *Id.* at 398.  The court noted that "the threshold question" was not whether

-38-

the restraint on alienation was reasonable, "but whether the challenged instrument is a restraint on alienation at all." *Id.* at 399. It concluded on that issue:

> . . . even assuming that the use restriction at issue in this case creates a practical impairment to the marketability of the property, it is not an indirect restraint on alienation. Hy-Vee cannot restrict or prohibit the sale of Spanish Oaks' interest in the property, and Spanish Oaks is free to sell or hold the property as it sees fit. Despite a possible reduction in market price, Spanish Oaks still has both the legal and practical ability to alienate its interest in the property. This situation does not resemble a restraint on alienation of the kind that courts have generally refused to uphold and enforce. . . . Even assuming that the potential market value of Spanish Oaks' fee simple interest is in some way diminished by the presence of the use restriction, that does not make the use restriction an indirect restraint on alienation . . . .

*Id.* at 399-400.

I note that cases have, however, construed leases allowing a billboard to be maintained on a property to be restraints on alienation, albeit indirect restraints. *See Lamar Advertising,* 213 P.3d at 644.[13] Even if I assume that authority to be applicable to the narrow Restrictive Clause at issue here, making it a restraint on alienation (albeit an indirect restraint), I find that the Restrictive Clause is enforceable.

On that issue, I note that courts vary on the issue of what test applies to determine the enforceability of an indirect restraint on alienation. The Wyoming Supreme Court in *Lamar Advertising* held that indirect restraints are subject to a "rational

---

[13] As explained in that case, "[u]nlike a direct restraint, an indirect restraint does not place express limitations on the owner's right to convey the property." *Id.* at 644. An indirect restraint on alienation "'arises when an attempt is made to accomplish some purpose other than the restraint of alienability, but with the incidental result that the instrument, if valid, would restrain practical alienability.'" *Id.* (quotation omitted). The lease in *Lamar Advertising* "was simply a servitude that had the potential effect of restraining alienation by limiting the value or use of the property." *Id.* at 245. As such, "it amounted to an indirect restraint on alienation." *Id.; see also Spanish Oaks,* 655 N.W.2d at 399. The same analysis applies to the Restrictive Clause in this case.

justification" test rather than a reasonableness test, "as the economic principles that make direct restraints on alienation do not apply in the context" of such restraints, especially in the commercial context.  213 P.3d at 645.  Under that test, "[t]he fact that the servitude limits the market for property by limiting its use or reducing its value... is irrelevant in determining its validity, so long as there is some rational justification for creation of the servitude."  *Id.* (quoting the Restatement (Third) of Property: Servitudes § 3.5 cmt. a).  I find some merit to this holding.  I also find that there was a rational justification for the Restrictive Clause at issue as CBS asserts that it was given in exchange for the termination provision to be added to the 2006 Lease.  *See id.* ("'Servitudes created in commercial transactions seldom lack rational justification.'") (quoting § 3.5 cmt. b).

Even if I apply the reasonableness test that 800 Lincoln relies on, I find that the Restrictive Clause meets this standard.  In making the reasonableness determination, the courts have looked at various factors, such as whether the covenant is limited to territory and duration.  *Perry*, 614 P.2d at 367; *Vaughn v. Gen. Outdoor Adver. Co.*, 352 S.W.2d 562, 564 (Ky. 1962).  In *Vaughn,* the restriction was reasonable in that it was limited in territory to a city lot and in duration to a maximum period of 10 years.  Similarly, here, the Restrictive Clause limits its application in time (only until January 2016, the remaining term of the 2006 Lease) and location (only the roof of the Building).

Moreover, CBS asserts that it agreed to grant Capone Company, the lessor, the flexibility to terminate the 2006 Lease, even though the Lease did not originally have a termination provision, by preserving its existing interest in the Sign through inclusion of

the Restrictive Clause.  Based on this, I find "[t]here is no inequity visible from such a

provision."  *Malouff*, 509 P. 2d at 1244; *see also Perry*, 614 P.2d at 367 (test for

reasonableness requires the court to look at "the respective interests of the parties").

My finding that the Restrictive Clause is enforceable is consistent with the many

cases that have upheld the validity of restraints on alienation related to billboards or

outdoor advertising.  *See Lamar Advertising*, 213 P.3d at 645-46 (finding a servitude that

had the potential effect of restraining alienation by limiting the use of a property related to

a billboard was an indirect restraint on alienation for which there was a rational

justification); *Vaughan*, 352 S.W.2d at 564 (upholding the enforceability of a restrictive

covenant in a lease to a billboard company providing that the lessor would not permit any

adjoining premises owned by him to be used for advertising purposes); *Russell v. Ohio

Outdoor Adver. Corp.*, 701 N.E.2d 417, 419 (Ohio App. 6 Dist. 1997) (recognizing the

validity of a restrictive covenant that prohibited advertisement of competitor on a

billboard).  My finding is also consistent with cases outside the billboard context

upholding covenants that restrict the type of businesses that can be conducted on a

leased property.  *See, e.g.*, *Spanish Oaks*, 655 N.W.2d at 397; *J.C. Penney Co. v. Giant

Eagle, Inc.*, 813 F. Supp. 360, 370 (W.D. Penn. 1992) (finding restrictive covenant

whereby landlord granted lessee exclusive right to operate drug store on property was

enforceable and not against public interest as it was limited in scope to a shopping

center); *Winrock Enters., Inc. v. House of Fabrics of New Mexico, Inc.*, 579 P.2d 787,

789-90 (N.M. 1978) (upholding restrictive covenant that limited lessee from establishing

competing business within two miles of shopping center).

Finally and importantly, 800 Lincoln has not set forth any evidence or even argument to supports its contention that the Restrictive Clause is unreasonable. Rather, the totality of 800 Lincoln's argument related to this issue is that the Restrictive Clause is "per se unreasonable." Such a conclusory argument, which cites no facts and no law, is not sufficient to create a genuine issue of fact as to the reasonableness of the Restrictive Clause.[14]

Thus, that even if the Restrictive Clause is a restraint on alienation, I find it is not unreasonable and is enforceable as a matter of law. Accordingly, I grant Plaintiff's Motion for Summary Judgment on its claim for declaratory judgment that no party other than CBS can maintain or operate an off-site commercial advertising sign on the roof of the building owned by 800 Lincoln until January 2, 2016, pursuant to the Restrictive Clause.

IV.  CONCLUSION

Based upon the foregoing, it is

ORDERED that Plaintiff's Motion for Summary Judgment filed on January 13, 2012 (ECF No. 26) is **GRANTED IN PART AND DENIED IN PART**. It is granted on CBS' claims for declaratory judgment that: (1) CBS is the legal owner of the Sign at issue

---

[14] In so holding, I reject 800 Lincoln's argument that the reasonability analysis requires the sort of factual inquiry that precludes summary judgment. The case cited by 800 Lincoln for this argument, *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1241 (Colo. 1998), is inapposite as does not address restraints on alienation. Moreover, legal questions that inherently involve a question of fact can be decided on summary judgment if there is no genuine issue of fact for the trier of fact to determine. Fed. R. Civ. P. 56(c). Significantly, in *Lazy Dog,* the petitioner "presented genuine issues as to the[] material facts." In contrast, 800 Lincoln has presented *no* facts or argument as to how the Restrictive Clause is an unreasonable restraint, and therefore, has failed to present any genuine issue of material fact.

in this litigation, including the Framework; (2) no party other than CBS can maintain or operate any off-site commercial advertising sign on the building owned by 800 Lincoln until January 2, 2016.  It is also granted to the extent it seeks dismissal of 800 Lincoln's reciprocal claim for declaratory judgment that it is the owner of the Framework for the Sign.  Plaintiff's Motion for Summary Judgment is denied to the extent CBS seeks a declaratory judgment that it can remove the Framework, as there are genuine issues of material fact about whether it can be removed without material damage to the Building.  It is

FURTHER ORDERED that Defendant's Motion for Summary Judgment filed on October 21, 2011 (ECF No. 13) is **DENIED**.  Finally, it is

ORDERED that the parties shall meet and confer about the issues outlined on pages 27 and 28 of this Order as to whether the Framework is removable and file a status report by **Thursday, November 8, 2012**, as to whether a resolution was reached as to these issues and what action, if any, needs to be taken by the Court.

Dated:  September 24, 2012

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge